## In re TOWNSEND.
### Patent Appeal No. 2973.

Court of Customs and Patent Appeals.
June 20, 1932.

GRAHAM, Presiding Judge, dissenting in part.

W. E. Beatty, of Los Angeles, Cal. (Harris D. Hineline and Willis H. Taylor, Jr., both of New York City, of counsel), for appellant.

T. A. Hostetler, of Washington, D. C. (Howard S. Miller, of Washington, D. C., of counsel), for Commissioner of Patents.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

LENROOT, Associate Judge.

This is an appeal from a decision of the Board of Appeals of the United States Patent Office, affirming that of the Examiner, rejecting, for want of patentability over the prior art, claims 6, 7, 8, 9, 11, 13, 14, and 15 of appellant's application, filed December 29, 1924.

Claims 6, 9, and 13 are illustrative of the appealed claims, and read as follows:

"6. An arrangement for recording sound waves comprising a recording stylus adapted to impress sound wave undulations on a phonograph record blank, means adapted to be actuated by an existing phonograph record for producing electrical waves corresponding with the sound recorded on that existing record and for amplifying the same, an electrically operated device for actuating the recording stylus, said device being responsive to said electrical waves and adapted to be actuated thereby, and a microphone connected in circuit with said electrically operated device and adapted to produce electrical current variations corresponding with sound waves impressed thereon, which current variations are impressed upon said electrically operated device."

"9. The method of making a phonograph record which consists in transferring the music, speech or the like recorded on an existing record to a record blank and recording and amplifying supplemental sound waves on the same record blank in superposition to the sound wave record transferred and amplified from the said existing record."

"13. A phonographic recording system comprising a pair of rotatable tables, a phonograph record mounted on one of the tables and rotatable therewith, a record blank mounted on the other table and rotatable therewith, a stylus engaging the sound groove of the phonograph record, means operable in response to vibrations imparted to the stylus to produce fluctuating electrical energy corresponding to said vibrations, a recording stylus engaging the record blank, an electrical actuating device for the recording stylus, circuit connections for impressing said fluctuating electrical energy on said device, a vacuum tube amplifier included in said circuit connections, a microphone pick-up electrically connected with said actuating device whereby sound waves other than those recorded on the phonograph record may be impressed on the record blank, and a telephone receiver included in the circuit connections and interposed between the reproducing stylus and said vacuum tube amplifier for reproducing the sound waves from the original phonograph record without blending them with the waves transmitted through said microphone pick-up."

The references relied upon are: De Forest, 1,375,447, April 19, 1921; Vreeland et al., 1,593,735, July 27, 1926; Wier, 1,617,-428, February 15, 1927; Craft et al., 1,540,-317, June 2, 1925.

Appellant's application relates to sound recording apparatus, the salient features of which may be summarized as follows: A phonograph record is placed upon

a rotatable table, and upon said record there is placed a stylus; said stylus is connected to an armature positioned between the poles of a magnet, the armature being surrounded by a coil of wire. This coil is connected in circuit with an amplifier; thence to a similar coil surrounding a second armature positioned between the poles of a second magnet. This latter armature is connected to a stylus which rests upon a blank record; said record being also placed upon a rotatable table. The movement of the first stylus as it progresses in the sound groove of the phonograph record produces fluctuations in the circuit in which the coils and the amplifier are connected; said fluctuations corresponding to the vibrations produced in the stylus. The reverse action takes place on the second turntable; these fluctuations in electrical current being translated into mechanical vibrations of the stylus on the blank record, thereby recording on said blank record a sound groove similar to that possessed by the playing record. Between the first-named stylus and the amplifier there is connected across this circuit a telephone receiver, which enables one to hear only the reproduction of the phonograph record. Connected in circuit with the coil on the second armature is a microphone, the same being also connected through an amplifier; this microphone, employed by one utilizing said telephone receiver, enables him to produce on the receiving record sounds supplemental to the sounds reproduced thereon from the first record. There is also connected across this second coil another telephone receiver which enables one to hear both the sounds being transmitted from the playing record and also the sounds being impressed by the microphone, whereas, as stated with reference to the first telephone receiver, only the sounds produced by the playing record are audible through it. The object of the apparatus is to enable one to reproduce on a blank record the subject-matter of an existing phonograph record, coincident with such other supplemental sounds as are desired. For example, a record playing the instrumental music of a song may be played; the operator may listen to this music through the first-named telephone receiver, and, in time with the music, sing into the microphone. The result will be that the record on the second turntable will have impressed upon it a sound groove that will reproduce the instrumental music of the existing record, together with the vocal rendition of the operator.

The patent to De Forest discloses a method of amplifying currents in electrical sound recording and reproducing systems, in which vacuum tube amplifiers are used.

The patent to Vreeland et al. relates to the art of recording sounds upon records; it involves the use of a plurality of microphones at different points in a room, the circuits from which all feed into a common circuit which actuates the recorded magnet with an effect which is the result of all the microphones; there is also shown means by which the director may listen to the result of all the microphones and so be enabled to make adjustments in the position of one or all of the microphones, or of the performers, to bring about the best result. There is also provided means for controlling the amount of amplification secured.

The patent to Craft and the one to Weir are the principal references. Craft sought to overcome what he claimed was a deficiency in the method of recording sound from a plurality of microphones. He indicates that, where two or more microphones are being used, the voice of a singer, for example, will register most strongly on the microphone nearest to him; however, it will also register in the other microphones. He states that there is a delay in the effect of the more distant microphone reaching the actuating magnet for the recording stylus, due to its receiving the sound later, and that the impressions of the one voice on the two microphones would not register on the blank record at the same instant, resulting in an echo effect being produced when said record is played. He sought to overcome this by interposing between each microphone circuit and the common circuit what is referred to as an artificial line; the same being capable of adjustment in such manner as to delay the transmission of current to the common circuit to any extent desired within certain limits. Accordingly, in the above example, the artificial line in circuit with the microphone nearest the singer would be adjusted to delay transmission over this circuit just enough to synchronize the effects of the two microphones in the common circuit, thus disposing of said echo effect. His structure shows three microphones, the currents in which circuits are amplified by thermionic amplifiers; these currents are impressed in common upon the electromagnet which actuates the recording stylus. There is connected a telephone which, by means of a switch, may be connected to each microphone circuit individually, or to the common circuit, enabling the control man to listen to the output of any microphone, or of all three.

The patent to Weir is primarily for an electrical phonograph. A record is placed on a turntable, upon which record rests a stylus. The vibrations of the stylus operate to cause fluctuations in an electrical circuit. The current passes through a succession of wave filters, the purpose of which is to eliminate any undesirable frequency which may have been superimposed during the recording of the record being played and so eliminate the resulting tone produced by the stylus in passing over the record. This circuit is ultimately inductively connected to a common circuit, which in turn is connected to loud speakers through other wave filters. Means are shown for connecting two other reproducers, operating on other records, which producers are similarly connected to the common circuit and thence to the loud speakers. There is interposed in the secondary of the last wave filter preceding the common circuit a variable resistance, by means of which it is possible to vary the volume of the impulses being transmitted over this individual circuit. Also, presumably, a similar resistance would be interposed in the circuits of the other two reproducers at the same point in their individual circuits, or just before they join the common circuit. In the last wave filter, the one preceding the loud speakers, there is a variable resistance by means of which it is possible to control the volume of the common circuit, thus intensifying or decreasing the output of the loud speakers. The common circuit is also used to energize a second circuit, independent of the loud speakers, whereby a stylus is actuated and cuts upon a receiving blank a sound groove which corresponds to the variations of current in the common circuit.

It is clear from the references, and appellant admits, that each of the elements required in the several claims is found in the prior art, but appellant contends that he has so combined these elements in his application as to produce a new and useful result, which involved the exercise of the inventive faculty.

The Examiner and the Board of Appeals held that appellant's combination did not constitute invention, and that the reference Weir, while confined to sounds originating in phonograph records, contemplated simultaneous recording of the same upon a blank record, and that said reference showed a means of varying the volume of sound reproduced from the whole group of records or independently varying the volume of the sound produced by any one of them.

Appellant contends that the reference Weir does not contemplate the simultaneous recording from the group of records, but that Weir's idea was that the group of records might be recorded successively upon the blank. With reference to this point, the Board of Appeals stated: "It is noted that lines 16 to 25, page 2 of Weir, include the statement, in substance, that, resistance 16 makes it possible to vary the volume of sound produced from the *whole group of records* while the adjustable resistance 12 serves to vary the volume of the sound produced by any one record. This disclosure appears to indicate that these records may be used simultaneously. * * * "

We are inclined to the view that appellant's contention is correct, and that Weir did not contemplate the simultaneous recording of the various records for the reason that, so far as any teaching of Weir is concerned, if said records were recorded simultaneously, there would be produced nothing but a discordant jumble of sound. We believe there are instances where two pieces of music may be played harmoniously together, but these instances are so comparatively rare as to negative the suggestion that Weir had such a purpose in mind. Furthermore, assuming that a group of records was suitable for such a purpose, simultaneous recording of them upon a common record, to produce a harmonious result, could only be brought about in the presence of some method of synchronization. Inasmuch as Weir shows no means of synchronization, we are of the opinion that he did not contemplate a simultaneous playing of the group of records.

We believe the Board has misinterpreted the portion of Weir's specification to which it makes reference in the above-quoted matter. It must be borne in mind that Weir had in mind primarily an electrical phonograph, and it is significant that the resistance 16, whereby the volume produced from the whole group of records is controlled, is found to be positioned only in the circuit restricted to the loud speakers of the phonograph apparatus; it has no effect whatever upon the control of volume in the circuit which actuates the recording stylus. Its purpose is clearly to suit the intensity of the phonograph reproduction to the type of room in which the machine is operating, much in the same manner as one controls the volume of his radio to suit his room. The individual resistances 12, referred to by the Board, are, we think, for the purpose of providing a means whereby the operator may preset a volume for each individual record peculiarly suited thereto, thereafter being enabled to

play a succession of records without resorting to the common control for each record.

But, even assuming that Weir contemplated the simultaneous recording of a plurality of records on a common blank record, the tribunals of the Patent Office, we think, lost sight of the fact that some of the claims in issue, to which we will later refer, clearly provide for the recording on a blank record of sounds originating in an existing phonograph record, and in addition the simultaneous recording of sounds supplemental to the sounds produced by said phonographic record and synchronized therewith. It is our opinion, therefore, that Weir does not show or suggest the precise object of appellant, which is as above stated.

In his discussion of Weir, the Examiner stated as follows: " * ' * Pick-ups 22 and 23 are electrically connected by means of the transformers shown with the actuating or recording device 25, whereby *sound waves other than those recorded on record (25) may be impressed on the record blank.* * * * " (Italics ours.)

The pick-ups to which the Examiner here refers appear in the Weir drawings only as terminal connections whereby additional input circuits may be connected. In speaking of these pick-up connections, Weir has this to say in his specification: " * * * Connections 22 and 23 are for the purpose of connecting other individual *reproducers* to the common circuit 11." (Italics ours.)

Earlier in his specification he refers to this common circuit 11 in the following terms: " * * * The current is then induced in the secondary 8 which is in series with the primary coil 9 and thence to the secondary 10 which is connected in circuit with a common circuit 11, *common to a plurality of individual reproducers such as 4.* * * * "

The reproducer 4, referred to in the last quotation, is the reproducer with stylus which rests upon the existing phonograph record. It is clear therefore that Weir had in mind the transfer to a common record of sounds originating only in phonographic records; and, if the Examiner, by the above-quoted statement, meant to imply that Weir disclosed a method of recording sounds from a record together with other sounds not originating in records, then such an inference on his part was not, in our judgment, warranted from the presence of the pick-up connections 22 and 23.

The reference Craft clearly shows the microphone feature of appellant's combination, and also the simultaneous recording of sounds from a plurality of microphones upon a common record blank; connections are also shown whereby the operator is enabled to listen to the sounds picked up by any one of said microphones, or to listen to the aggregate of sounds resulting from all. It is clear, however, that Craft contemplated merely a simultaneous recording of the sounds produced by various performers, by means of individual microphones, under conditions which presented no difficulty in the matter of synchronization; in other words, each of the performers could hear all of the other performers.

The question before us, therefore, is whether, in view of the references, it involved the exercise of the inventive faculty so to arrange the various elements as to permit the reproduction upon a blank record of the sounds from a phonograph record and also other sounds, supplemental thereto and synchronized therewith; said supplemental sounds being contributed through a microphone, the person contributing or controlling said supplemental sounds being permitted to listen to the sound produced by the original record and control the supplemental sounds accordingly.

In our opinion this objective is neither shown nor suggested by any or all of the references, and, in our view, it constitutes a distinct contribution to the art and involves the exercise of the inventive faculty. Therefore all of the claims upon appeal which embrace such a combination should be allowed, and we will proceed to consider these claims to determine which, if any of them, are limited to a combination accomplishing the above result.

Claim 6 provides for a reproducing stylus on an existing record, a second stylus electrically operated to impress a sound wave on a blank record responsive to the sound wave of the existing record, and a microphone whereby to register other sounds, connections to said microphone by means of which the recording stylus may be actuated by electrical current fluctuations resulting from said other sounds. All of these features are old in the art, and there are no limitations in the claim which call for a simultaneous and synchronized recording of the sounds originating in the two sources; accordingly we find that claim 6 was properly rejected.

Claim 7 includes means for electrically transmitting and amplifying sound wave undulations from a phonograph record to a record blank, together with "electrical means in circuit with said means for simultaneously

impressing supplementary and amplified sound wave undulations on said record blank." We think the quoted limitation brings this claim within the class which, as indicated above, should be allowed. The word "supplementary" is defined in Webster's New International Dictionary as follows: "Supplementary: added to supply what is wanted; additional; serving as a supplement."

The word "supplement," used as a noun, is defined by the same authority as: "Supplement: 1. that which supplies a want; * * * 2. that which completes, or makes an addition to, something already organized, arranged, or set apart. * * *"

The word "supplement," used as a verb, is there defined as: "Supplement: to fill up or supply by additions; to add something to; to fill the deficiencies of."

In view of the foregoing, having in mind the art involved, we think that this claim, involving as it does the *simultaneous* recording of *supplementary* sounds, requires that the sounds from both sources be synchronized, and said claim falls within the class of claims which should be allowed.

Claim 8 is a method claim providing for the existing record and the production of supplemental sound waves, with connections whereby both sound sources actuate an electromagnetic cutter upon a blank record. Said claim contains the following: "*Synchronizing* said first mentioned electrical energy with said *supplemental* electrical energy." (Italics ours.) This claim clearly meets the requirement of synchronization of the sound from the two sources, and should be allowed.

Claim 9 is also a method claim, and contains the following: "And recording and amplifying *supplemental* sound waves on the same record blank *in superposition* to the sound wave record transferred and amplified from the said existing record." (Italics ours.) We think this claim is allowable for the same reason as given with respect to claims 7 and 8.

Claim 11 is an apparatus claim, and recites the various elements set forth in our description of appellant's disclosure, with the exception of the telephone receiver in the common circuit. The other telephone receiver, over which one may hear only the sounds reproduced from the existing record, is a specific element of the claim, and, together with the other elements set out, presents a combination which, in our opinion is patentable over the prior art.

Claim 13, hereinbefore quoted, likewise sets out the various elements, with the exception of the common circuit telephone receiver. This claim is much the same as claim 11 in substance, and is allowable for the same reason.

Claim 14, like claims 11 and 13, is an apparatus claim. The principal difference between this claim and claims 11 and 13 is that there is included as an element the telephone receiver in the common circuit, whereby one may listen to both sound reproductions, the one from the microphone and the other from the record, but may not listen to either individually, while the single circuit receiver present in said claims 11 and 13 is omitted in claim 14. Thus it appears that the combination detailed in claim 14 is not limited to apparatus that includes the synchronization of the two sets of sound waves, and for that reason we think this claim was properly rejected. The presence of the common circuit receiver adds nothing to the patentability of any claim, and we are of the opinion that this claim fails to distinguish from the references cited.

Claim 15, also an apparatus claim, is similar in substance to claims 11 and 13, and includes as elements both of the telephone receivers hereinabove referred to. This claim is allowable for the same reason stated with respect to claims 11 and 13.

For the reasons stated, the decision of the Board of Appeals is reversed as to claims 7, 8, 9, 11, 13, and 15, and affirmed as to claims 6 and 14.

Modified.

GRAHAM, Presiding Judge, dissents as to claim 11, and thinks it should be denied.